IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

PAMELA GORDON,

      Plaintiff,

V.                               CIVIL ACTION NO. 3:06-0282

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## **MEMORANDUM ORDER**

      In this action, filed under the provisions of 42 U.S.C. §1383(c)(3), plaintiff seeks review of the final decision of the Commissioner of Social Security denying her application for supplemental security income based on disability. The case is presently pending before the Court on cross-motions of the parties for judgment on the pleadings.

      Plaintiff protectively filed her application on August 12, 2002, alleging disability as a consequence of "high blood pressure, rheumatoid arthritis, vertigo, anxiety disorder and tendinitis." On appeal from an initial and reconsidered denial, an administrative law judge, after hearing, found plaintiff not disabled in a decision which became the final decision of the Commissioner when the Appeals Council denied a request for review. Thereafter, plaintiff filed this action seeking review of the Commissioner's decision.

      At the time of the administrative decision, plaintiff was thirty-nine years of age and had obtained a GED and two years of college. Her past relevant employment experience consisted

of work as a cashier.  In his decision, the administrative law judge determined that plaintiff suffers from "COPD and hypertension," impairments which are severe.  He found that she had the residual functional capacity for a significant range of medium level work and that her past work was not inconsistent with this finding.  On the basis of these findings, and relying on Rule 203.28 of the medical-vocational guidelines[1] and the testimony of a vocational expert,[2] he found plaintiff not disabled.

Review of the record reveals deficiencies which will require remand for further proceedings.  The "severe" impairments which the administrative law judge identified were chronic obstructive pulmonary disease and hypertension, but his decision reflects he did not adequately take into account the exertional and nonexertional restrictions from these conditions.  Both are well documented in the medical evidence.  Numerous reports show plaintiff's blood pressure readings were high, many times significantly higher than normal, and this condition was frequently characterized as uncontrolled.  Plaintiff underwent cardiac stress testing on April 28, 2003, and the results indicated the blood pressure response to exercise was "exaggerated," and the test had to be stopped due to extreme blood pressure elevation.  In terms of end organ damage, there was an observation at the Pleasant Valley Hospital emergency room on April 5, 2004, of "some" narrowing of the arteries in plaintiff's eyes.  She also testified that high blood pressure caused headaches.

In assessing residual functional capacity, the administrative law judge, unfortunately, did not contact Dr. Tayengco, plaintiff's treating physician.  Instead, he chose to rely on the June

---

[1] 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 3.

[2] Though determining that plaintiff could perform her past work, the administrative law judge went on to question a vocational expert about other work she could perform if unable to do past work.

24, 2003, opinion of a non-examining state agency medical advisor who found plaintiff capable of medium level work with additional limitations of concentrated exposure to extreme cold and humidity. This evaluator's notes are focused mainly on plaintiff's strength, range of motion and other findings relative to whether she suffers from arthritis. Though he notes a history of hypertension, there is no indication this reviewer appreciated the uncontrolled nature of this condition or considered whether it would preclude plaintiff from climbing ladders, ropes or scaffolds, working at heights, around dangerous, moving machinery or other limitations typically found to be related to this condition.

With regard to plaintiff's chronic obstructive pulmonary disease ("COPD"), the evidence reflects a hospitalization on February 27, 2003, for chest pain related to chronic bronchitis, likely caused by smoking. A chest X-ray was interpreted as consistent with cardiomegaly[3] and acute congestive heart failure. Additional diagnoses included unstable angina and uncontrolled hypertension. Plaintiff was admitted to the hospital for two days on May 15, 2003, for an exacerbation of chronic obstructive pulmonary disease. Though improved at discharge, she was still noted to have moderate breathing distress with ambulation.

On November 17, 2003, Dr. Tayengco recorded plaintiff's complaints of dyspnea on exertion and that she could hardly walk one block without becoming short of breath and could not climb any stairs. Exam revealed prolonged expiratory phase of respiration, poor air movement and limited chest expansion. It was noted she was taking two medications for breathing as well as using an inhaler.

---

[3] Enlargement of the heart. Attorney's Dictionary of Medicine C-81 (2007).

Evidence submitted to the Appeals Council includes an abnormal chest X-ray showing an enlarged lymph node and a CT scan of the chest performed on February 9, 2004, interpreted as consistent with a linear scarring pattern in the left lung, although no mass was detected. Pulmonary function testing performed this date was consistent with moderate to severe airflow obstruction with no response to bronchodilation and severe decrease in diffusion capacity. Symptoms were observed to be the same at a June 8, 2004, follow-up visit, and Dr. Tayengco concluded plaintiff's COPD seemed to be stable. A chest X-ray taken on September 8, 2004, was interpreted as showing mild cardiomegaly due to a "left ventricular prominence." It was also noted that PPD skin testing done at that time was positive, although there were no changes suggestive of active tuberculosis shown by X-ray.

As with plaintiff's hypertension, the administrative law judge found her chronic obstructive pulmonary disease was a "severe" impairment "significantly" limiting her physical ability to do basic work activity.[4] He again relied on the state agency medical advisor's assessment for guidance on how it limited plaintiff's ability to work instead of seeking comments/opinions from her treating physician. The only limitations this nonexamining physician found were those noted relative to avoidance of concentrated exposure to extreme cold and humidity.

In reviewing this assessment, it is observed that the state agency medical advisor did not mention the diagnosis of COPD and did not discuss any findings related to it. His explanation was clearly focused mainly on physical findings relative to arthritis, and it does not appear that he considered whether pulmonary problems would have an impact on her ability to lift and carry, walk, perform postural activities or be exposed to environmental factors such as extreme heat or dust,

---

[4] 20 C.F.R. §416.920(c).

fumes and other pulmonary irritants. The state agency medical advisor's findings are clearly deficient given just the evidence in the record at the time of his assessment. The evidence submitted to the Appeals Council is even more compelling that plaintiff's COPD is of a level of severity that would call into question her ability to perform work at the medium level of exertion. The Court thus concludes that remand is necessary for the reevaluation of plaintiff's residual functional capacity taking adequate account of her uncontrolled hypertension and significant chronic obstructive pulmonary disease. An opinion from her treating physician should be sought with regard to the combined effect of these conditions on her ability to work.

With regard to plaintiff's joint pain, the administrative law judge determined, based on the opinion of the state agency medical advisor, that her osteoarthritis was "mild and stable," and thus he found that this was not a "severe" impairment. This reviewing physician cited just a few of the numerous findings from the October 30, 2002, consultative exam by Dr. Nutter, noting only his report of a normal gait, negative straight leg raising and full muscle strength in the upper extremities. What he does not list are findings by Dr. Nutter of pain and tenderness in numerous areas such as the shoulders, elbows, wrists, hands, knees, ankles, feet, dorsolumbar spine, and hips. Swelling was observed in the left elbow and possibly in a couple fingers and one of her ankles. Crepitus was heard in the shoulders and knees. Grip strength was reduced and plaintiff was unable to make a tight fist on her own. Dr. Nutter also noted he was unable to pry her fingers apart during exam. Dorsiflexion strength in the right foot was decreased, she was not able to stand on the left leg alone and could not squat due to knee pain. She also had a positive Patrick test in her hips.[5] Finally, range

---

[5] This test is used to distinguish Arthritis of the hip joint from sciatica. A positive finding indicates arthritis of the hip joint. Attorney's Dictionary of Medicine, supra at P-111.

of motion restrictions were documented in the shoulders, wrists, cervical spine, lumbar spine and hips. X-rays of the left knee and right hand were interpreted as normal. It is apparent that Dr. Nutter's findings indicate widespread arthralgia,[6] which was his diagnosis.

The state agency reviewer also cited to a March 10, 2003, report from Dr. Ralph Webb to whom plaintiff had been referred by Dr. Tayengco for evaluation of joint pain and a determination as to whether she suffered from rheumatoid arthritis. On this date, Dr. Webb observed mild crepitus in the shoulders and knees but no inflammation or thickening of the finger joints. He diagnosed osteoarthritis but was unsure whether inflammatory arthritis was also present. Dr. Tayengco's reports from July 2002 reflect findings of "significant" limitation of motion of the ankles and wrists with swelling and in September he observed "significant" swelling of the finger joints and both wrists as well as crepitus in the knees.

On July 9, 2003, Dr. Webb noted there was no discrete synovitis present in the peripheral joints, although there was tenderness in the wrist joints. He opined that, clinically, plaintiff did not appear to have rheumatoid arthritis but may have "indolent systemic lupus" or some sort of "overlap disorder." In November 2003, a bone densitometry study was interpreted as showing normal bone density. On January 6, 2004, Dr. Tayengco reported "significant symptoms" in this regard but did not include findings as to plaintiff's joints in this report. He did indicate she should be referred back to Dr. Webb.

Plaintiff has consistently characterized her joint symptoms as intermittent with flare-ups not always occurring in the same areas. The evidence could be considered consistent with this assertion since she did not complain of joint symptoms on every occasion that she saw Dr.

---

[6] Joint pain. Id. at A-538.

Tayengco; however, without any kind of assessment or opinion from either this physician or Dr. Webb, or both, it is difficult to determine the length and severity of her flare-ups and thus just what impact they have on her ability to work. Certainly, the findings of Dr. Nutter in October 2002 and the reports from the treating physician during the rest of 2002 do not support the state agency medical advisor's finding that this condition was "mild" or necessarily "stable." Plaintiff did testify that the medication Bextra provided some relief, but she still experienced periods of pain, stiffness and limited use. On remand the administrative law judge should question treating sources further about this condition and be careful to consider the combined limitations of osteoarthritis along with hypertension and pulmonary impairments. The parties should also be given the opportunity to submit additional evidence.

On the basis of the foregoing, it is **ORDERED** that this case be remanded to the Commissioner for further proceedings consistent with this Memorandum Order. All matters in this case being concluded, it is **ORDERED** dismissed and retired from the Court's docket.

The Clerk is directed to transmit a copy of this Memorandum Order to all counsel of record.

ENTER: November 7, 2008

_____
MAURICE G. TAYLOR, JR.
UNITED STATES MAGISTRATE JUDGE